<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>KEN ANDERSON,<br><br>Defendant. | Case No. 2:22-cr-00826 (BRM)<br><br>**OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is Defendant Ken Anderson's ("Anderson") Motion to Suppress ("Motion") (ECF No. 31) handguns found inside his backpack. The United States of America ("Government") opposed on October 23, 2024 (ECF No. 33), and Anderson replied on December 5, 2024 (ECF No. 36). The Court held an evidentiary hearing regarding the Motion on February 19, 2025 (ECF No. 41), and the parties submitted final briefings on February 25, 2025 (ECF Nos. 42–43). Having reviewed the submissions filed in connection with the Motion and having held oral argument on February 19, 2025, for the reasons set forth below and for good cause having been shown, Defendant's Motion to Suppress (ECF No. 31) is **DENIED**.

**I.    BACKGROUND**

    **A.  Factual Background**

Anderson's Motion challenges a search and seizure of firearms and live ammunition. According to a report by Sheriff Detective Nicholas Rodriguez ("Detective Rodriguez") of the Essex County Sherriff's Office, he and Detective Sergeant Christopher Bozios, Jr. ("Sergeant Bozios") met with a reliable confidential informant ("CI") on July 25, 2022. (ECF No. 31 at 1.) The CI relayed information to Detective Rodriguez and Sergeant Bozios about "a skinny black

male, with dreads, wearing a black tee shirt, black jeans, and white sneakers who was armed with a handgun." (*Id.*) The CI also told them this individual was driving a black Nissan Altima with heavily tinted windows and gave them a specific temporary license plate number and address at which the individual was last seen. (*Id.* at 1–2.) According to Detective Rodriguez, the CI had been found to be reliable by the detectives of the Essex County Sheriff's Office because he previously supplied accurate information that resulted in arrests involving narcotics and weapons in the past. (*Id.* at 2.) After receiving the information from the CI concerning the individual, Detective Rodriguez, Sergeant Bozios, and three other officers went to the location identified by the CI, where they observed a car matching the description the CI had provided. (*Id.*) Sergeant Bozios then directed backup police units to "conduct a stop to further investigate the CI's allegations." (*Id.*) Detective Rodriguez stated that once he activated the emergency lights on his police vehicle, the car identified by the detectives as matching the CI's description CI—which was being driven by Anderson—began driving down the street in reverse. (*Id.*)

According to Detective Rodriguez, Anderson proceeded away from the police until, at some point, "he jumped out of the Nissan and fled down an alleyway with a black backpack in his hand." (*Id.*) At that point, Detective Rodriguez stated he and Detective Petrucci exposed their police badges, said "police," and began chasing Anderson down the street. (*Id.*) While giving chase, the detectives "ordered Anderson to 'drop the backpack.'" (*Id.*) Once Anderson was apprehended by the police, Detective Rodriguez stated the backpack was "partially opened, allowing him to observe a black handgun inside." (*Id.* at 3.) Detective Rodriguez then conducted a more thorough search of the backpack and uncovered the following items: "(1) Defaced Ruger LCPII .380 chambered with (1) Hollow Point bullet and a magazine containing (6) ball point

bullets; and (2) Hi-Point Model C9 9mm serial #P1941577 chambered with (1) Hollow Point bullet and a magazine containing (5) Hollow Point bullets and (3) ball point bullets." (*Id.*)

Anderson's account of the encounter with police differs considerably from that provided by the detectives; he asserts "he initially complied with law enforcement by remaining parked when approached by police" and "only fled when the police began pointing their weapons at him." (*Id.*; *see also* ECF No. 31-3, Ex. B, Certification of Ken Anderson ("Anderson Certification"), at 1.) Moreover, Anderson insists his backpack was never unzipped or open in any way and was always on his person until it was taken by the police. (*Id.*)

### B. Procedural History

On October 4, 2022, the Government filed a criminal complaint against Anderson charging him with one count of possession of firearms and ammunition by a convicted felon. (ECF No. 1 at 2.) On December 8, 2022, a grand jury issued an indictment ("Indictment") alleging Anderson knowingly possessed firearms and ammunition despite having been previously convicted of a crime punishable by a term of imprisonment exceeding one year, in violation of 18 U.S.C. § 922(g)(1). (ECF No. 3 at 1.) On December 22, 2022, Anderson was arrested and went before Magistrate Judge Jessica S. Allen for an initial appearance and arraignment, at which he entered a plea of Not Guilty to Count I of the Indictment. (ECF Nos. 5–6.) The parties submitted a scheduling order for the exchange and production of discovery and filing of pretrial motions, which was signed by the Court on March 13, 2023. (ECF No. 13 at 1–2.) On December 28, 2023, the Government moved for a continuance through January 11, 2024 (ECF No. 19), which the Court signed on December 29, 2023 (ECF No. 20).[1]

---

[1] The Court signed five orders to continue prior to this motion (*see* ECF Nos. 1–12, 14–15, 17), as well as five such orders thereafter (*see* ECF Nos. 23, 26, 29, 35, 39), on various grounds, including

3

On July 24, 2024, Anderson filed an Omnibus Motion requesting "meaningful discovery" ahead of trial and the Motion to Suppress. (ECF No. 31.) The Government opposed the Motion to Suppress (ECF No. 33) and the Omnibus Motion (ECF No. 34) on October 23, 2024. Anderson filed a reply regarding the Motion to Suppress (ECF No. 36) on December 5, 2024. On January 31, 2025, the Court issued an Order granting in part and denying in part Anderson's Omnibus Motion and setting an evidentiary hearing regarding the Motion to Suppress for February 19, 2025.[2] (ECF No. 40.) Following the evidentiary hearing, the parties filed supplemental briefs concerning the Motion to Suppress on February 25, 2025. (ECF Nos. 42–43.)

### C. Suppression Hearing Testimony

On February 19, 2025, the Court held an evidentiary hearing on the issue of whether the CI's tip provided reasonable suspicion needed to justify the initial stop by officers. (ECF No. 44 (Transcript of Hearing ("Tr.")) at 3:12–15, 4:3–5.) The only witness called to testify during the

---

to accommodate Anderson's request for the appointment of new defense counsel, to permit defense counsel reasonable time necessary for effective preparation, and to permit the parties to complete motion practice. In each order, Anderson expressed his consent despite his awareness of the right to have the matter brought to trial within 70 days of his appearance before a judicial officer pursuant to 18 U.S.C. § 3161(c).

[2] In its opposition to the Motion, the Government took the position that an evidentiary hearing was not needed because Anderson failed to show there was a "disputed issue[] of material fact that will affect the outcome of the motion to suppress." (ECF No. 33 at 4–5 (quoting *United States v. Hines*, 628 F.3d 101, 105 (3d Cir. 2010).) According to the Government, the Anderson Certification only presented three facts that contradicted facts in the police report—namely, that Anderson initially complied with law enforcement and only drove off when police pointed weapons at him, his backpack was always in his possession and was never unzipped or otherwise open, and it was fully closed when police took it away—all of which support, even if assumed to be true, nevertheless support the seizure because: "(1) officers had reasonable suspicion to stop Anderson based on the CI's information . . . ; (2) after Anderson fled from police, . . . law enforcement had probable cause to arrest [him] and search the backpack incident to that arrest . . . ; and (3) officers had authority to search Anderson's backpack as a search before transportation and as an inventory search." (*Id.* at 7.) During oral arguments held on January 28, 2025, concerning Anderson's Omnibus Motion and Motion to Suppress, the Court granted the request for an evidentiary hearing over the Government's objection. (ECF No. 38.)

hearing was Detective Rodriguez.[3] (*See generally*, *id.*) Detective Rodriguez testified he and Sergeant Bozios met with the CI inside a police vehicle in the North Newark area roughly 15 to 20 minutes after the CI called Sergeant Bozios with the tip. (*Id.* at 15:9–17.) During that face-to-face interaction, Detective Rodriguez stated the CI described the suspect's physical appearance, clothing, hair, car, and location, and provided a temporary license plate number. (*Id.* at 16:3–18, 17:24–25, 18:1.) He testified the location described by the CI is known as "a high-crime area, lot of drug activity, shootings, gang activity." (*Id.* at 18:14–16.) Detective Rodriguez attested to the CI's credibility, noting the CI had a calm demeanor, answered his and Sergeant Bozios's questions (*id.* at 12:16), and had proven reliable "six or seven times" in the roughly seven years since the CI

---

[3] In a sidebar conference during the evidentiary hearing, defense counsel argued for calling Sergeant Bozios as a second witness on the grounds that Detective Rodriguez had no personal knowledge of the CI's reliability and was thus not credible. (Tr. at 57:8–12.) The Government argued four out of the five *Torres* reliability indicia were met with Detective Rodriguez's testimony alone. (*Id.* at 57:13–17 (citing *United States v. Torres*, 534 F.3d 207, 211 (3d Cir. 2008).) The Government further asserted even if the tip had been made anonymously, it would have given rise to reasonable suspicion under *Nelson* given the detailed nature of the information conveyed. (*Id.* at 57:18–58:2 (citing *United States v. Nelson*, 284 F.3d 472, 481 (3d Cir. 2002).)

The Court's credibility determinations for all witnesses are based not only on a witness's response to a particular question, but also the witness's physical reaction (*i.e.*, body language, facial expressions, furtive movements, shifting, squirming, folding of their arms). *See* Third Circuit Model Civil Jury Instructions § 1.7 (noting a jury should consider several factors in determining the credibility of a witness including "(1) the opportunity and ability of the witness to see or hear or know the things the witness testifies to; (2) the quality of the witness's understanding and memory; (3) the witness's manner while testifying; (4) whether the witness has an interest in the outcome of the case or any motive, bias or prejudice; (5) whether the witness is contradicted by anything the witness said or wrote before trial or by other evidence; (6) how reasonable the witness's testimony is when considered in the light of other evidence that you believe; and (7) any other factors that bear on believability"). Based on these factors, the Court finds Detective Rodriguez to be a credible witness.

At the end of the hearing, the Court left the question of calling Sergeant Bozios to the Government to decide in its final brief whether it was willing to rest without his testimony. (*Id.* at 59:10–13, 60:11–13.) In their final briefs, neither the Government nor Anderson requested calling Sergeant Bozios to testify. (*See generally* ECF Nos. 42–43.)

started working as an informant for the Essex County Sheriff's Office (*id.* at 19:8–9). Following the meeting with the CI, Detective Rodriguez indicated Sergeant Bozios took him back to the headquarters, at which time he and another detective got into another vehicle and "set up, ready to act on the information that was given to [them]" (*id.* at 19: 23–25), while Sergeant Bozios and the CI drove to the area where the CI said the suspect was located (*id.* at 20:4–5). Once Sergeant Bozios "spotted the vehicle" matching the description provided by the CI (*id.* at 21:18), he told the detectives to "go and investigate the car" (*id.* at 22:2).

During cross-examination of Detective Rodriguez, defense counsel elicited testimony about what transpired during the face-to-face meeting between Detective Rodriguez, Sergeant Bozios, and the CI; the timeline between when the CI directly observed the information relayed and when officers acted upon it; and how the officers within the Essex County Sheriff's Office document and verify the reliability of their informants. (*See generally id.* at 25–57.) Detective Rodriguez testified neither he nor Sergeant Bozios took notes on their conversation with the CI, including the suspect's name or the specific temporary license plate number, or called the police station to initiate a background search of the suspect or a registration search of the license plate number. (*Id.* at 25:16–31:23, 45:23–49:9.) Detective Rodriguez also testified he was unaware of an established written procedure for documenting when a CI had provided reliable or unreliable information (*Id.* at 33:11–39:6, 41:19–45:19, 49:10–51:5), and he did not have personal knowledge of the CI's reliability at the time of the face-to-face meeting (*Id.* at 32:24–35:10, 49:15–25). However, Detective Rodriguez stated the officers would communicate within the Essex County Sheriff's Office (and raise the information up the chain of command) when a CI provided information that later proved to be inaccurate and would thereafter no longer work with that CI. (*Id.* at 36:9–38:2.)

6

On redirect, Detective Rodriguez stated he believed the information the CI gave "was fresh" based upon how quickly he and his fellow officers acted upon that information in the immediate aftermath of the conversation with the CI. (*Id.* at 62:7.) Detective Rodriguez also insisted on recross examination that the CI conveyed "the man had a gun, was armed with a gun," not multiple guns. (*Id.* at 63:21–64:9.)

## II. LEGAL STANDARD

Federal Rule of Criminal Procedure 41(h) provides "[a] defendant may move to suppress evidence in the court where trial will occur, as Rule 12 provides." Fed. R. Crim. P. 41(h). Rule 12 requires suppression motions be made prior to trial. Fed. R. Crim. P. 12 (b)(3)(C).

The Supreme Court "created the exclusionary rule, a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Davis v. United States*, 564 U.S. 229, 231 (2011). The Fourth Amendment provides, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable search and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV; *see Herring v. United States*, 555 U.S. 135, 136 (2009) ("The Fourth Amendment forbids 'unreasonable searches and seizures,' and this usually requires the police to have probable cause or a warrant before making an arrest.").

Recognizing that police officers must often act quickly and cannot always expend time obtaining a warrant, the Supreme Court carved out an exception to the warrant requirement, whereby police officers may stop someone to conduct a brief investigatory search or seizure of their person or vehicle (a "*Terry* stop") where there is reasonable suspicion based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[s] th[e] intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Courts must assess both the facts

7

known to officers dispatched to a scene and those known to the dispatcher in determining the reasonableness of a *Terry* stop. *United States v. Torres*, 534 F.3d 207, 210 (3d Cir. 2008). Courts should examine "the totality of the circumstances—the whole picture" when assessing reasonable suspicion. *United States v. Brown*, 448 F.3d 239, 247 (3d Cir. 2006).

"When a *Terry* stop is based on a tip provided by an informant, [the court] must scrutinize the informant's 'veracity, reliability, and basis of knowledge' to determine whether the information relied upon by the police was sufficient to establish reasonable suspicion for the stop." *United States v. Johnson*, 592 F.3d 442, 449 (3d Cir. 2010) (quoting *Torres*, 534 F.3d at 210). The court in *Torres* outlined the following indicators of reliability:

> (1) The tip information was relayed from the informant to the officer in a face-to-face interaction such that the officer had an opportunity to appraise the witness's credibility through observation.
> (2) The person providing the tip can be held responsible if her allegations turn out to be fabricated.
> (3) The content of the tip is not information that would be available to any observer.
> (4) The person providing the information has recently witnessed the alleged criminal activity.
> (5) The tip predicts what will follow, as this provides police the means to test the informant's knowledge or credibility.

534 F.3d at 211. Where a tip is not sufficiently reliable, courts have found other factors can provide additional support, including "[the p]resence of a suspect in a high crime area" and "[a] suspect's nervous, evasive behavior, or flight from police." *Id.* (citing *Brown*, 448 F.3d at 251). The timing of the information relative to the commission of a crime may also be a key consideration for reliability because "when criminal activity is reported to be ongoing, the public expects the police to take action." *United States v. Nelson*, 284 F.3d 472, 480 (3d Cir. 2002) (citing *United States v. Valentine*, 232 F.3d 350, 356 (3d Cir. 2002)).

8

Generally, "[t]he proponent of a motion to suppress has the burden of establishing that his Fourth Amendment rights were violated." *United States v. Acosta*, 965 F.2d 1248, 1257 n.9 (3d Cir. 1992) (citing *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978)). However, "[i]n the case of a warrantless search, the government bears the burden to show that the search or seizure was reasonable," *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995), by "point[ing] to specific and articulable facts," *Terry*, 392 U.S. at 21. "Any evidence obtained pursuant to an investigatory [*Terry*] stop . . . that does not meet th[e] exception [to the warrant requirement] must be suppressed as 'fruit of the poisonous tree.'" *Brown*, 448 F.3d at 244.

### III. DECISION

Anderson advances two arguments. He first challenges the reliability of the CI because it is unknown whether the CI's tip came from personal knowledge. (ECF No. 31 at 7–8.) If it did not come from the CI's personal knowledge, Anderson argues the information "is akin to an anonymous tip" which must meet the reliability indicia under *Torres*, which, in Anderson's estimation, it fails to do. (*Id.*) Second, Anderson contends the search of his backpack which revealed the guns constitutes a warrantless search because the guns were not in "plain view."[4] (*Id.* at 8.) Anderson also requested an evidentiary hearing to investigate the above issues (*id.* at 8), which the Government opposed (ECF No. 33 at 4–7). As mentioned in the procedural history, *infra* Section I.B., the Court granted Anderson's request for an evidentiary hearing, which was held on February 19, 2025.

---

[4] Under the doctrine of plain view, "[i]f police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *United States v. Yamba*, 506 F.3d 251, 257–58 (3d Cir. 2007).

The Government argues the officers had reasonable suspicion to stop Anderson because the CI's tip included many details which were corroborated by Sergeant Bozios's and the other officers' personal observations at the scene, and there is therefore no basis to suppress the evidence. (ECF No. 33 at 7.) The Government disputes Anderson's assertion that the CI's tip would be less reliable if it did not come from personal knowledge, arguing "there is no [such] legal requirement." (*Id.* at 9.) Even if the CI's tip is considered anonymous, the Government contends the undisputed facts show the tip meets at least four of the five indicia of reliability under *Torres* and therefore gives rise to reasonable suspicion. (*Id.* at 11–12.) Citing to *Nelson*, in which the Third Circuit found reasonable suspicion supported law enforcement's stop of the suspect's vehicle despite an anonymous tip, the Government asserts the facts in this case "are arguably stronger" because the CI met face-to-face with the officers, "was identifiable and could be held accountable for incorrect information, had proven reliable in the past, and provided detailed and specific information that accurately predicted the whereabouts of the subject individual." (*Id.* at 13 (citing *Nelson*, 284 F.3d at 481).) Finally, the Government argues the search of Anderson's backpack and discovery of the guns and bullets inside was lawful under either the doctrine of plain view or abandonment, and offers that even under Anderson's version of events, the search was lawful under the exceptions to the warrant requirement for either a search incident to arrest or a pre-transportation/inventory search. (*Id.* at 14.)

In his post-hearing brief, Anderson argues the CI tip was not sufficiently reliable to give rise to reasonable suspicion for the officers' search and seizure. (ECF No. 42 at 4.) Specifically, Anderson contends Detective Rodriguez's testimony shows: (1) no notes were taken during the face-to-face meeting with the CI; (2) no written procedures exist to document instances of CIs providing false information; (3) nothing concrete substantiates the claim the CI had reported

"fresh" information witnessed on the same day; (4) the tip did not accurately predict where the gun was located (or the presence of multiple guns), and (5) no written account exists in the Essex County Sherriff's Office to confirm the accuracy and consistency of the CI's tip and the facts as found on the scene. (*Id.*) In its brief, the Government insists the face-to-face meeting between the officers and the CI enabled them to assess his credibility. (ECF No. 43 at 3.) Further, the Government asserts the CI has been known to the Essex County Sheriff's Office for "at least 'seven years'" and proven reliable on "six or seven" occasions in the past, the CI provided "highly detailed information," the CI had "personally and recently observed Anderson's possession of a firearm," and the officers were able to verify the accuracy of the tip. (*Id.* at 3–4.) The Government contends Anderson's arguments about the problematic nature of Detective Rodriguez's testimony regarding further investigative steps that could have been taken, like running information through databases, distract from the essential question the Court must answer: "[t]he question is not whether the officers could have done more, but whether what they did was enough." (*Id.* at 4.) Furthermore, the Government argues even if the Court does not find reasonable suspicion justifying an exception to the warrant requirement, Anderson's flight from police both justified the officers' suspicion he was carrying a firearm and constituted obstruction of justice in violation of several state laws. (*Id.* at 4–5.) Finally, the Government asserts the search of Anderson's backpack was lawful as a pre-transportation search and under the inventory search doctrine. (*Id.* at 5.)

      Here, the Court finds Sergeant Bozios and Detective Rodriguez had reasonable suspicion to conduct a *Terry* stop and search of Anderson because they received detailed information from a reliable confidential informant. Detective Rodriguez's testimony regarding the contents of the CI's tip as well as the CI's credibility and reliability demonstrate the officers received very specific information, acted quickly upon that information, and found it to be accurate as they discovered

Anderson in possession of two firearms and ammunition. (Tr. at 16:3–22:8.) Importantly, even assuming the tip was made anonymously, the information possessed sufficient indicia of reliability to support reasonable suspicion and justify the police officers' attempt to carry out a *Terry* stop and the subsequent search of the backpack. The Court finds the CI's information meets all five indicia of reliability under *Torres*.[5] *See* 534 F.3d at 211. Detective Rodriguez and Sergeant Bozios met face-to-face with the CI, with whom their office had a seven-year-long history of interaction, during which the CI conveyed reliable information "six or seven times," and could therefore sufficiently assess his credibility. (Tr. at 12:16.) The CI's information was highly detailed, including specific information about the suspect's clothing and car, and proven accurate by Sergeant Bozios and Detective Rodriguez through direct observation on the scene. (Tr. at 17:21–18:10, 21:14–22:8.) Detective Rodriguez also testified the CI's information "was fresh" and based on same-day observation of illegal activity. (Tr. at 62:7.) Moreover, Anderson's presence in "a high-crime area" (Tr. at 18:14–16), as well as his flight from police (ECF No. 31 at 2–3), further buttress a finding of reasonable suspicion, on top of the detailed tip from a known and reliable CI, *see Torres*, 534 F.3d at 211 (citing *Brown*, 448 F.3d at 251). Because the Court finds the CI's tip contained indicia of reliability giving rise to reasonable suspicion to justify the *Terry* stop in this case, evidence obtained in the subsequent search, including of Anderson's backpack, is likewise lawful. *See Chimel v. California*, 395 U.S. 752, 763 (1969) ("There is ample justification [] for a search of [an] arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence."); *but see Brown*, 448 F.3d at 244 (citing *Wong Sun v. United States*, 371 U.S. 471, 488

---

[5] Of note, neither party disputes that the officers' direct observation on the scene matched the information provided by the CI concerning the description of the suspect, his location, and the car he was driving. (*See* ECF No. 31 at 1–2.)

(1963) (holding evidence that "come[s] to light" by exploiting unlawful police action is fruit of the poisonous tree)).

The testimony by Detective Rodriguez concerning the lack of notetaking during the face-to-face communication with the CI, not calling the police station to run the license plate number, and the absence of a discernible written procedure for verifying the reliability of CIs gives pause but is irrelevant to the reasonable suspicion inquiry under *Torres*. (*See generally* Tr. at 25–57.) The Court is satisfied that both the testimony at the hearing as well as the information contained in the parties' briefs confirm the police acted expeditiously upon receiving the information in a face-to-face interaction with a CI they knew had been reliable in the past. (Tr. at 12:8–24, 15:12–18:10.) Law enforcement is allowed some grace when officers act in a less-than-perfect manner while in receipt of time-sensitive information regarding the commission of a crime, particularly one involving a violent weapon. *See Nelson*, 284 F.3d at 480 (citing *Valentine*, 232 F.3d at 356) ("[G]iven . . . the danger posed by an armed criminal, we think that if the police officers had done nothing and continued on their way after receiving the informant's tip, the officers would have been remiss."). Accordingly, Anderson's Motion to Suppress is **DENIED**.

### IV. CONCLUSION

For the reasons set forth above, and for good cause having been shown, Defendant Anderson's Motion to Suppress (ECF No. 31) is **DENIED**. An appropriate order follows.

Date: April 8, 2025

*/s/ Brian R. Martinotti*
**HON. BRIAN R. MARTINOTTI**
UNITED STATES DISTRICT JUDGE